Mary Young Moore v. Commissioner.
Moore v. Commissioner
Docket Nos. 17207 and 19383.
United States Tax Court
T.C. Memo 1955-219; 1955 Tax Ct. Memo LEXIS 124; 14 T.C.M. (CCH) 869; T.C.M. (RIA) 55219; July 29, 1955
*124 In 1938, petitioner inherited a one-half interest in certain real property located in the downtown section of Los Angeles. to a 99-year lease on the property, made in 1924, petitioner is entitled to receive annual rental payments of $120,000 until the year 2023 for her inherited one-half of the property. 1. Held, the premium value of this lease is a depreciable capital asset which will be fully exhausted by the year 2023. 2. Held, further, the fair market value of this capital asset in 1938 was $1,000,000. Melvin D. Wilson, Esq., Title Insurance Building, Los Angeles, Calif. *125 , for the petitioner. George E. Constable, Esq., for the respondent. RICE
Supplemental Memorandum Findings of Fact and Opinion This proceeding is before us on remand from the United States Court of Appeals for the Ninth Circuit for further proceedings in accordance with the opinion of that court, appearing at , certiorari denied . In that opinion, the court reversed our prior holdings in this proceeding, which appear at . We must now decide, pursuant to the mandate, (1) whether the premium value of a 99-year lease made in 1924, on land inherited by petitioner in 1938 (at which time the rentals being paid pursuant to the lease were substantially in excess of the fair market rentals of the property), is an asset subject to ultimate exhaustion and, hence, amortizable by petitioner; and (2) if amortizable, what is the basis of such asset. Petitioner filed returns for the years here involved with the collector of internal revenue for the sixth district of California. Respondent determined deficiencies and petitioner claimed overpayments for such years as follows: Deficiency
Overpayment
Year
Proposed
Claimed
1943
$22,650.98
$19,171.26
1944
19,135.06
20,070.82
1945
16,074.28
29,292.39
*126 Supplemental Findings of Fact The following facts are summarized from our Findings of Fact at and from hearings subsequently held in this proceeding on November 1, 1954, and November 15, 1954. For many years prior to 1924, petitioner and her mother owned as tenants in common certain property located in the downtown section of Los Angeles, California. On October 1, 1924, petitioner and her mother entered into a 99-year lease covering such property for a period from October 1, 1924 to September 30, 2023. The lease called for the payment of a rental of $10,000 per month through June 30, 1926, and thereafter, $20,000 per month until the expiration of the lease in the year 2023. The lessee agreed to pay taxes, levies, and all other charges on the property, to remove the buildings then standing on the land, and, at its own expense, to construct a building to cost not less than $2,000,000. The lease also provided that the lessors were to be the owners of the new building upon its construction, but that as soon as it was paid for and there was no danger of mechanic's liens falling upon the real estate, the lessee could assign the lease to anyone and be *127 relieved of any further obligation thereunder. The lessee of the property was the Sun Realty Company, and it was contemplated by petitioner and the lessee at the time the lease was entered into that the property would be subleased to Barker Bros., Inc., of Delaware. This sublease was entered into on October 30, 1924, for a period to run until December 31, 1960. The lessee demolished the buildings previously erected by petitioner and her mother and caused to be constructed, at its own cost and expense, an 11-story building which was completed on January 1, 1926. This building is known as the Barker Bros. Building, and was still occupied by the sublessee, Barker Bros., Inc., at the time of the hearing herein. It has a 50-year estimated life from January 1, 1926. On October 1, 1924, when petitioner and her mother leased the property for a 99-year term, Los Angeles was in the midst of a real estate boom. There had been particular activity during 1923 and 1924 in the area in which this property is located. It appeared, at that time, that this area would become the center of a higher class trade than the downtown Broadway section. However, the business depression in the 1930's affected *128 this area more drastically than it did most of the downtown sections. Almost all of the fine shops moved out and the effort to establish it as an exclusive shopping area failed. By 1938, the rental value of properties located in the vicinity of petitioner's property had declined by 75 to 80 per cent from the boom-time rentals of 1923 and 1924. The assessed value of a one-half interest in petitioner's land for real property taxation purposes was in the amounts of $391,290 and $351,395 during 1938 and 1939, respectively. Petitioner's mother died on November 3, 1938, and her one-half interest in the abovementioned real estate, lease, and building passed to petitioner. This one-half interest was evaluated for estate tax purposes at $1,533,100, representing a compromise figure between the Government and the estate of petitioner's mother. The real estate, lease, and building were not individually evaluated in the estate tax proceedings. On income tax returns filed for 1943, 1944, and 1945, petitioner claimed deductions for the amortization of the remaining portion of the 99-year lease on the property, using a basis of $826,644. No depreciation was claimed on the building. Respondent *129 disallowed such amortization deductions and determined the deficiencies here in issue. Prior to the receipt of the deficiency notices, petitioner filed claims for refunds for the years 1943, 1944, and 1945 based on grounds, some of which are covered in the petitions in the instant proceedings. In these petitions, petitioner claimed that she should be permitted to amortize the lease over the period November 3, 1938 to December 31, 1960. She also claimed the right to depreciate the building over the remainder of its 50-year life expectancy. Petitioner allocated the $1,533,100 compromise estate tax value for the property in the following manner in arriving at the basis to be used for the amortization of the lease and the depreciation of the building: Land
$ 400,000
Building
487,500
Lease
645,600
Total
$1,533,100
We held, in our opinion in this proceeding at , that petitioner was entitled to deduct depreciation on her inherited one-half of the building, calculated on a fair market value of $800,000 for such one-half at the time it was inherited, but that she could not take amortization deductions with respect to the lease. These holdings *130 were reversed by the Court of Appeals in its opinion at . That court held that petitioner had no depreciable interest in the building, but that the favorable aspect of the lease was a separate capital asset which was amortizable to the year 2023, provided that it was subject to ultimate exhaustion. By amended pleadings, petitioner claims that the $1,533,100 compromise estate tax value of the property inherited from her mother is to be allocated in the following manner in determining the basis to be used for amortization of the lease: Land
$ 400,000
Premium portion of lease
1,133,100
Total
$1,533,100
Assuming that the one-half interest in the land inherited by petitioner from her mother on November 3, 1938, was not leased on that date, although improved by the building then situated on it, such one-half interest would have been worth $400,000 in 1938, and its fair rental value would have been $24,000 per year, plus taxes, repairs, and insurance. These valuations exclude any value attributable to the building. The value of land in the area in which petitioner's land is located increased between 1938 and 1954, but selling *131 prices did not reach one-half of those obtainable during the real estate boom in the early 1920's. Petitioner's land is located on the fringe of the central business district and has been affected by the decentralization of Los Angeles to a greater degree than properties in the heart of the main business district. Petitioner's expert witnesses were unable to determine what the rental value of the land would be in either 1960, 1975, or 2023. In 1937, the right to receive rentals, for a 19-year period, from land in downtown Los Angeles on which Bullock's Department Store was located, was placed in trust. Participating interests were then sold to investors at prices to yield a return of 2 1/2 to 5 per cent. On November 3, 1938, when a one-half interest in the property was inherited by petitioner, the annual rental of $120,000 required by the lease for such one-half interest was $96,000 in excess of its fair market rental value of $24,000. The fair market value of the one-half interest in the premium portion of the lease inherited by petitioner on November 3, 1938, amounted to $1,000,000 on that date. Opinion RICE, Judge: The first issue to be decided under the mandate is whether *132 the premium value of the lease inherited by petitioner is subject to ultimate exhaustion by the year 2023 and, hence, amortizable. If that issue is decided affirmatively, we must then determine the basis to be used by petitioner for the amortization of this capital asset. Pursuant to the mandate of the Court of Appeals, we regard petitioner as having inherited two separate items, namely, a parcel of real property and a very advantageous lease thereon. The fair market rental of the property, at the time inherited, is to be regarded as an incident of the fee and poses no problem. However, petitioner's right to the premium rentals for the remaining term of the 99-year lease must, under the mandate, be treated as a depreciable capital asset. Since, under sections 113(a)(5), 113(b), 114(a), and 23(n) of the 1939 Code, [1] one who inherits a depreciable capital asset is treated as a purchaser for the purpose of recovering his hypothetical investment by deducting depreciation, petitioner is entitled to amortize the premium value of her inherited portion of the lease, if such premium value is subject to ultimate exhaustion. *133 The opinion of the Court of Appeals in the instant case indicates that the issue of ultimate exhaustion is to be resolved by determining whether, upon the termination of her lease in the year 2023, petitioner will be able to rent the property for the same amount she now receives pursuant to the lease. If an equally favorable rental can be obtained in the year 2023, that court would treat the premium value of the lease, at the time acquired in 1938, as not subject to ultimate exhaustion and, therefore, non-amortizable. In accordance with the mandate, we held further hearings in the present proceeding to permit the parties to introduce evidence as to the rental value of the property upon the termination of the lease in 2023. However, neither of petitioner's expert witnesses was able to estimate the rental value of the property at that date, or even in 1975 or 1960. The present decline of the area in which petitioner's property is located as an exclusive shopping district and the effect of decentralization upon the entire downtown shopping area did not appear to be a sufficient basis upon which the experts could estimate the rental value of petitioner's property at a date many years *134 in the future. Nevertheless, we think the issue of ultimate exhaustion is susceptible of solution. The following statement from the Court of Appeals' opinion, at page 274, indicates the course to be followed: "Now, if we were dealing with a taxpayer who, on November 3, 1938, purchased a half interest in the whole property for $1,533,100, and if it appeared that at the time the rents being paid were in excess of the fair market rentals of the property, and if the price paid took this latter fact into consideration, it must have included a bonus or premium for the acquisition of the 'favorable' features of the lease. * * * The lease, or rather the portion thereof providing the abovenormal rents, is an intangible asset with a definitely limited life. As the Supreme Court has said of depreciation: 'The end and purpose of it all is to approximate and reflect the financial consequences to the taxpayer of the subtle effects of time and use on the value of his capital assets. For this purpose it is sound accounting practice annually to accrue as to each classification of depreciable property an amount which at the time it is retired will with its salvage value replace the original investment *135 therein.' . In our hypothetical case of a 1938 purchaser on this half interest, if the premium paid on account of the higher rents to be received under the lease may not be amortized by deductions over the period of the lease, his original investment will not be replaced as the Code contemplates. Applicable is Regulation 111, Sec. 29.23(1)(3) relating to depreciation of intangible property: '* * * If, however, an intangible asset acquired through capital outlay is known from experience to be of value in the business or in the production of income for only a limited period, the length of which can be estimated from experience with reasonable certainty, such intangible asset may be the subject of a depreciation allowance. * * *'" In addition to the land, what the petitioner must be regarded as having purchased, and did in fact acquire in 1938, was a contract calling for the payment of fixed rentals above the then current rental value of the property for a period of years extending to the year 2023. The contract is a depreciable capital asset having a limited and determinable existence. Exhaustion *136 of her rights under the lease will be complete in the year 2023 because, in that year, her right to the rentals fixed by the lease will terminate. Fluctuation in the rental value of the property during the term of the lease and the rental obtainable thereafter have no relation to the rights acquired by a purchaser of the lease. The hypothetical price paid for the premium value should properly be amortizable to permit petitioner to recover the "cost of her investment" without being taxed thereon. Thus, taxpayers who possessed leaseholds on March 1, 1913, having a determinable value, have been permitted to amortize such value over the remaining term of their leases without reference to the rental value of the property at the expiration of their leases. ; ; . Also it is a well established principle that one who purchases a lessee's interest in a lease is permitted to amortize the cost of his lease over its term. (C.A. 5, 1940), certiorari denied . *137 See . The purchaser of the lease is not required to show that it cannot be renewed on as favorable terms upon its termination, since the amount paid for his lease was meant to secure a favorable rental for a determinate period of time; hence, it is amortizable during this period of time. Similarly, the purchaser of a contract which entitles him to buy merchandise for a period of years at less than the market price at the time the contract was entered into has been permitted to amortize the cost of the contract over its term without a showing that such merchandise will not be available at as favorable prices upon the expiration of the contract. (C.A. 6, 1941); . Cf. . The asset which petitioner acquired is the assurance that rentals will be paid, in an amount above the rental value of the property in 1938, for a period of 85 years. The amount which petitioner must be regarded as having paid for such asset is a depreciable capital expenditure *138 and must be amortized over the period in which the income from such contract will be earned. We are here dealing with a determinate period of time, namely, the remaining portion of the lease extending from 1938 to 2023. There is no question of renewal rights which might require the original cost of the lease to be amortized over a period longer than the original term or even might require the lease to be regarded as having an indeterminate term. Under the mandate, petitioner must be treated as having bargained for and purchased a rental contract in excess of the current market rental for a determinate period of years, and the cost of this contract is properly amortizable during the years in which such excess rentals will be received, extending to the year 2023. We turn next to the question of what basis is to be used by petitioner in amortizing the premium value of her inherited one-half of the lease. Pursuant to sections 113(a)(5) and 114 of the 1939 Code, such basis is the fair market value of the property at the time it was inherited. The parties have stipulated that the $1,533,100 compromise estate tax value of petitioner's inherited interests in the land, lease, and building *139 shall be the aggregate value of such interests in the present proceeding. Acknowledging the Court of Appeals' holding that she has no interest in the building, petitioner has attempted to prove the fair market value of the premium portion of the lease by proving the fair market value of the land and subtracting this amount ($400,000) from the aggregate compromise value. But where we are dealing with an aggregate amount reached as the result of a compromise, proof as to the actual fair market value of one of the components cannot be subtracted from the total compromise value in order to prove the actual fair market value of the other component. It is entirely possible that the 1938 fair market value of the land plus the fair market value of the premium rentals fails to equal or exceeds the stipulated aggregate amount of $1,533,100. We must, therefore, rely on proof which was directed exactly at the item in question, namely, the fair market value of the premium rentals. We have found as a fact, after consideration of all the evidence as to the rental value of similar properties in 1938, that the property inherited by petitioner had an annual rental value of $24,000 in that year. Assuming *140 that a net rental of $120,000 was received by petitioner pursuant to the lease for this inherited one-half of the property, this resulted in an annual premium of $96,000. The question to be determined is what price would a purchaser pay in 1938 for the right to such premiums until the expiration of the lease in the year 2023. Petitioner introduced the testimony of two experts who had been active in the appraisal and sale of real estate in the Los Angeles area. They testified that they believed a purchaser would have paid the sum of $1,133,100 in 1938 for the premium portion of the lease. They based their estimate on the present value of annual payments of $96,000 which, in 1938, could be anticipated under the lease. In addition to the payments extending to 2023, they calculated the present value of payments extending to the termination of the Barker Bros. Lease and the value of payments which would cease upon the exhaustion of the useful life of the building. Different discount factors were applied to the various series of payments to take into account the various risks and the length of time involved. Both experts arrived at the following values: Period
Discount
Value
22 years (to end of Barker
Bros. lease)
6 per cent
$1,076,256
37 years (to end of useful
life of building)
8 per cent
1,009,334
84 years (to end of lease)
8 per cent
1,198,272
*141 Petitioner's experts supported their $1,133,100 estimate by testimony regarding the sale in 1939 of the premium portion of the lease of the land under Bullock's Department Store in Los Angeles. However, that lease extended only for a 19-year period and the discounts involved in that transaction ranged from 2 1/2 to 5 per cent. Respondent's expert witness also calculated the present worth of the $96,000 premium, as of 1938, for the periods to the end of the Barker Bros. lease, the end of the useful life of the building, and to the year 2023. However, after computing such annuity values, using 6 and 8 per cent discount tables, he applied further discounts ranging as high as 75 per cent to take into account his estimate of the speculative nature of purchasing an asset such as this. Based on his computations, he estimated that the fair market value of the premium portion of the lease was $750,000 in 1938. We have carefully considered all the factors involved in such a purchase and the testimony offered by the various experts. Unfortunately, evidence was introduced regarding only one similar transaction and the lease involved there ran for but a relatively short period. The balance *142 of the expert testimony was hypothetical, involving the question of what discount factor a purchaser would require in view of the various contingencies involved. However, in the light of the testimony of respondent's witness that the volume of business being done by the present tenant justified the rental it was paying, we believe that a purchaser could reasonably expect to continue receiving premium payments under the lease at least until the expiration of the sublease to Barker Bros. in 1960. Taking this, and all the other factors into consideration, we have found as a fact that the fair market value of the premium portion of the lease amounted to $1,000,000 in 1938. Decisions will be entered under Rule 50. Footnotes
1. SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. (a) Basis (Unadjusted) of Property. - The basis of property shall be the cost of such property; except that - * * *
(5) Property Transmitted at Death. - If the property was acquired by bequest, devise, or inheritance, or by the decedent's estate from the decedent, the basis shall be the fair market value of such property at the time of such acquisition. * * *
(b) Adjusted Basis. - The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided. * * *
SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION. (a) Basis for Depreciation. - The basis upon which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 113(b) for the purpose of determining the gain upon the sale or other disposition of such property. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(n) Basis for Depreciation and Depletion. - The basis upon which depletion, exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be as provided in section 114.↩